**SIGNED THIS: February 28, 2007**

_____
**MARY P. GORMAN**
**UNITED STATES BANKRUPTCY JUDGE**
_____

UNITED STATES BANKRUPTCY COURT

CENTRAL DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| In Re | ) | |
| | ) | In Bankruptcy |
| ALAN D. CARLTON and | ) | |
| DIANE S. CARLTON, | ) | Case No. 06-71322 |
| | ) | |
| Debtors. | ) | |

## O P I N I O N

This matter comes before the Court upon the request of Alan D. Carlton and Diane S. Carlton ("Debtors") for confirmation of their First Amended Chapter 13 Plan ("Amended Plan") and an Objection to Confirmation filed by the Chapter 13 Trustee. The Trustee asserts that the Debtors are not paying into the Amended Plan all of their projected disposable income for the applicable commitment period and, therefore, confirmation of the Amended Plan should be denied pursuant to 11 U.S.C. §1325(b)(1)(B). For the reasons set forth

-1-

below, the Court finds that the Debtors are proposing to contribute all of their projected disposable income to their Amended Plan and that the Amended Plan should be confirmed.

The Debtors filed their Chapter 13 Petition on September 28, 2006. At that time, they also filed all of the requisite Schedules, Statement of Financial Affairs, and Official Form 22C-Statement of Current Monthly Income and Calculation of Commitment Period and Disposable Income ("CMI"). The Debtors also filed an original Chapter 13 plan which proposed 60 monthly payments of $1,514. The Debtors' original plan provided for the payment of administrative expenses including Trustee and attorney fees, a priority debt to the IRS, three secured automobile loans, and a projected 7% dividend to unsecured creditors.

After attending their meeting of creditors and filing amended Schedules I and J and an amended CMI, the Debtors and their attorney were unable to reach an agreement with the Trustee about several issues related to the calculation of projected disposable income as that term is used in the Bankruptcy Abuse Prevention and Consumer Protection Act ("BAPCPA"). An initial presentation of the issues was made by the parties to the Court on January 11, 2007. At that time, the Debtors were granted leave to file their Amended Plan, Second Amended Schedules I and J, and a Second Amended CMI. The Amended Plan increases the Debtors' monthly payments to $1,714. The Trustee has filed an Objection to Confirmation of the Amended Plan and Objections to the Second Amended Schedule I and the Second

-2-

Amended CMI.  The Debtors have filed Responses to the Trustee's Objections.  The Court has agreed to take the matters under advisement and decide the contested issues to the extent they do not involve disputed facts.

*Calculation of Projected Disposable Income*

All of the Trustee's Objections relate generally to the Debtors' calculation of their projected disposable income.  The authority for the Trustee to require the Debtors to contribute their projected disposable income to their Amended Plan payments is found at Section 1325(b)(1)(B) of the Bankruptcy Code, which provides:

> (b)(1)  If the trustee or the holder of an allowed secured claim objects to the confirmation of the plan, then the court may not approve the plan unless, as of the effective date of the plan–
>
> * * * *
>
> (B)  the plan provides that all of the debtor's projected disposable income to be received in the applicable commitment period beginning on the date that the first payment is due under the plan will be applied to make payments to unsecured creditors under the plan.

11 U.S.C. §1325(b)(1)(B).

The concept of projected disposable income was first introduced into the Bankruptcy Code with the 1984 amendments and "was intended to be an economic test of the debtor's best efforts."

-3-

2 *Keith M. Lundin*, Chapter 13 Bankruptcy, 3d ed. § 163.1 (2000 & Supp. 2004).   The original best efforts or disposable income test was "defined as commitment of all projected income in excess of reasonable and necessary expenses for at least three years."  Id. If a trustee or unsecured creditor objected to a debtor's Chapter 13 plan, a debtor was required to pay unsecured claims in full or meet the disposable income test requirements.   11 U.S.C. §1325(b)(1)(B).

BAPCPA amended the disposable income test in several significant ways.   First, the concept of applicable commitment period was introduced which, depending on the income of the debtor, may extend to five years the period during which projected disposable income must be paid.  Id.  Second, projected disposable income is now calculated to determine payments, if any, "to unsecured creditors" under the plan.  Id.   Finally and most significantly, "disposable income" is now based on "current monthly income" minus reasonably necessary expenses and, for certain debtors with higher incomes, reasonably necessary expenses are determined, at least in part, by standards and formulae.  11 U.S.C. §1325(b)(2).

In order to determine compliance with these new statutory requirements, the CMI form - Official Form 22C - was developed for use by Chapter 13 debtors.   Part I of the CMI is labeled Report of Income and is used to calculate "current monthly income" as that term is defined by BAPCPA.   11 U.S.C. §101(10A).   The calculation

requires the addition of virtually all income the debtors earned or received during the six months before the month the case was filed and then the division of that total by six to determine the "current monthly income" of the debtors.

At Part II of the CMI, the applicable commitment period is calculated. The debtors' current monthly income previously determined at Part I is multiplied by 12 to reach an annualized figure. The annualized figure is then compared to the median family income of the debtors' state of residence for a similar household size. If the debtors' annualized income exceeds the comparable median income, the applicable commitment period for the debtors' plan is five years. If it does not, then the applicable commitment period is three years.

Part III of the CMI is used to determine which statutory methodology will be used to calculate disposable income. Again, the debtors' annualized income is compared to the median family income of their state for similarly-sized households. If the debtors' income exceeds the median income, then the "disposable income" and the reasonableness of the expenses claimed by the debtors will be calculated in accordance with the provisions of §1325(b)(3). If it does not, "disposable income" is calculated in accordance with §1325(b)(2) using the reasonably necessary expenses set forth on Schedule J.

Because §1325(b)(3) requires that the reasonably necessary expenses involved in the disposable income calculation be

-5-

determined according to the methodology set forth in §707(b)(2)(A)&(B), over-the-median-income debtors move on to Part IV of the CMI to calculate their available expense deductions. The available deductions are generally comprised of certain national and local standard deductions based on IRS guidelines, certain actual expenses allowed by IRS guidelines, other actual expenses allowed by §707(b)(2), payments for secured debts amortized over 60 months, payments for priority debts amortized over 60 months, and an estimate of Chapter 13 administrative expenses.

Part V of the CMI nets the current monthly income determined at Part I against the deductions available from Part IV. After allowing additional deductions for support income and retirement plan contributions, line 58 of Part V purports to calculate disposable income for over-the-median-income debtors.

Many courts have studied the CMI and the above-described calculation of disposable income. The clear majority weight of opinion is that these calculations do not result in a determination of a debtor's "projected disposable income" referred to in §1325(b)(1)(B). Further analysis is needed to compute projected disposable income and a court must consider, at a minimum, a debtor's actual income expected to be earned or available during the applicable commitment period in order to project disposable income available for plan payments. In re Grady, 343 B.R. 747, 750-51 (Bankr. N.D. Ga. 2006); In re Foster, 2006 WL 2621080 *6 (Bankr. N.D. Ind.); In re Ward, 2007 WL 63580 *2 (Bankr. W.D. Mo.);

-6-

In re Hardacre, 338 B.R. 718, 722 (Bankr. N.D. Tex. 2006); In re Fuller, 346 B.R. 472, 485 (Bankr. S.D. Ill. 2006). This Court agrees with the majority position and will determine the issues here accordingly.

*Trustee's Objection to Second Amended Schedule I*

The first step in calculating projected disposable income is to determine the actual income of the Debtors which is expected to be earned or be available to fund plan payments. That income is disclosed on Schedule I. The Debtors' Second Amended Schedule I is at issue here.

Mr. Carlton has been employed by the State of Illinois for 22 years as a prison guard. His gross income is $5,599 per month and, after taxes and mandatory withholdings for retirement and union dues, his monthly net income is $3,899.76. Mrs. Carlton has been employed as a teacher's aide by the Pleasant Hill School District for 20 years. Her income is more difficult to calculate on a monthly basis. She does not work and is not paid during the summer months and, apparently, even when she is working, her hours and pay are, to some degree, irregular.

On the Debtors' original Schedule I, Mrs. Carlton's gross monthly income was listed as $825 and her after-tax take-home was listed as $660. After meeting with the Trustee and reviewing a series of pay stubs, an amended Schedule I was filed listing her gross monthly income as $1,023.84 with an after-tax net of $644.18.

-7-

After the initial hearing, the Second Amended Schedule I was filed again listing Mrs. Carlton's monthly gross income as $1,023.84 but adjusting her net to $773.  The difference in net pay is the result of a downward adjustment in her retirement contribution.  The Debtors' attorney asserts that the Second Amended Schedule I figures were based on consultation with and agreement by the Chapter 13 Trustee as to how Mrs. Carlton's income should be calculated for Schedule I purposes.

The Trustee objects to the Second Amended Schedule I on the basis that it still does not accurately set forth Mrs. Carlton's income.  The Trustee now has in his possession Mrs. Carlton's final pay stub from December, 2006, which includes year-to-date figures and also has a copy of her 2006 W-2.  From the information on these documents, the Trustee calculates that Mrs. Carlton's average monthly income in 2006 was $1,105.74.  He also calculates that she averaged $118.04 in tax deductions and $49.76 in retirement deductions each month, resulting in an average monthly net income of $937.94.  It appears from the documents that the Trustee overlooked the deduction of Illinois income taxes from Mrs. Carlton's wages which averaged $31.68 per month.  Including this deduction would result in average monthly net pay of $906.26.

The Debtors do not dispute the accuracy of the Trustee's calculations but do question how many times they have to recalculate Mrs. Carlton's income.  The Debtors have cooperated in making information available to the Trustee and are frustrated at

the continuing recalculation of income after believing they had reached agreement with the Trustee on a fair method of calculation.

The Court is not unsympathetic to the Debtors' concerns, but cannot find that the Trustee's suggested method of determining an average monthly income for Mrs. Carlton is unfair. Mrs. Carlton's average income is somewhat of a moving target and taking a wider view by looking at a full year's worth of pay is not an unreasonable method of determining a fair figure.

Accordingly, the Court will sustain the Trustee's Objection to the Debtors' Second Amended Schedule I and will use Mrs. Carlton's income as calculated by the Trustee with the adjustment noted for Illinois income taxes in calculating projected disposable income. This ruling is without prejudice to the Debtors to file a further amended Schedule I and to seek a modification of their plan payments if Mrs. Carlton's actual hours and earnings in 2007 or future years do not keep pace with her earnings from 2006. Further, as will be discussed below, this ruling does not result in any change in the final calculation of the Debtors' projected disposable income and will not require an increase in the plan payments now proposed by the Debtors.

### *Trustee's Objection to Second Amended CMI*

The second step in calculating projected disposable income is to determine the reasonable and necessary expenses of the Debtors which may be deducted from their gross income. Under BAPCPA, that

analysis begins with completion of the CMI.

The Debtors' CMI discloses that their average monthly income based on their earnings during the six months before the case filing was $5,582.21.  This amount, calculated at Part I of the CMI, is the Debtors' "current monthly income."  11 U.S.C. §101(10A).  At Part II of the CMI, this current monthly income is multiplied by 12 to arrive at an annualized figure.  The Debtors annualized current monthly income is, therefore, $66,986.52.  The Debtors reside in Illinois and have one daughter who is a college student residing with them.  The median family income for a three person household in Illinois at the time of this case filing was $64,286.  Because the Debtors' annualized current monthly income exceeds the comparable median income, they are directed at line 17 of Part II to acknowledge that the applicable commitment period for their Chapter 13 plan payments must be 5 years.  Likewise, at line 23 of Part III of the CMI, because they are over-the-median-income debtors, they are required to acknowledge that their disposable income will be calculated under §1325(b)(3).

To calculate the Debtors' disposable income pursuant to §1325(b)(3), reference is made to §707(b)(2) and Part IV of the CMI.  The Debtors have completed Part IV but the Trustee alleges that some of the Debtors' calculations are inaccurate.  The Trustee finds fault with how the Debtors have computed the deductions for their vehicle expenses, telecommunications expenses, taxes, and health insurance.  The Trustee has also suggested changes which

have been accepted by the Debtors with respect to the national standard deduction for food and clothing and the amounts to be deducted for mandatory payroll deductions, priority payments, and administrative expenses.

The Debtors own three vehicles including a 2003 Cadillac Escalade, a 2006 Honda Civic, and a 1998 Chevrolet Monte Carlo. All three vehicles are pledged as collateral for secured indebtedness.  The Debtors owe $30,000 on the Escalade, $22,000 on the Civic and $3,000 on the Monte Carlo.  The Debtors' Amended Plan proposes to pay all of the debt secured by the vehicles through plan payments with interest at the rate of 7.75% per annum.

Deductions for expenses associated with the operation and ownership of vehicles are calculated in three different places on the CMI.  First, at line 27, a deduction is available for operating expenses.  The deduction amount is based on IRS local standards. Here, the Debtors used the local standard deduction of $358 for the Midwest Region for debtors operating "2 or more" vehicles.  The Trustee does not object to this deduction.

Second, at lines 28 and 29, deductions are available for the ownership expenses of two vehicles.  These ownership deductions are calculated by subtracting from the IRS standards for ownership of two vehicles, the "average monthly payment" as calculated at line 47 for the secured debt on each vehicle.  If the secured indebtedness on a vehicle exceeds the IRS standard, no ownership deduction is available for that particular vehicle.  At line 28,

-11-

the IRS standard for ownership of the first vehicle is shown as $471 and subtracted from that is $500 which purports to be the average monthly payment for one of the Debtors' vehicles.[1]  This results in no deduction being allowed at line 28.

At line 29, the IRS standard for a second vehicle is shown as $332 and from that, $66.67 which purports to be the average monthly payment on the Monte Carlo, is subtracted.[2]  This results in a deduction at line 29 of $265.33.  The Trustee objects to the Debtors' calculations on lines 28 and 29.  The Trustee asserts that the Debtors are obligated to use the highest average monthly payment for a vehicle from line 47 at line 28 and the second highest payment at line 29.  If the Debtors had done that, no deduction would be available at either line.

Finally, at line 47, deductions are allowed for the payment of secured debt.  Pursuant to §707(b)(2), debtors must calculate the amount contractually due on secured debt over the five-year

---

[1]  Although the $500 is identified as coming from line 47 as the average monthly payment for one of the Debtors' vehicles, it does not match any of the line 47 numbers on the Debtors' Second Amended CMI.  If the line 47 amount of $443.46 for the Civic had been used, an additional deduction of $27.54 would have resulted.  This discrepancy is confusing but does not change the end result regarding the calculation of the Debtors' disposable income.

[2]  Although both parties describe the $66.67 deduction for secured debt as the average monthly payment for the Monte Carlo, the number for that payment shown on line 47 is $60.48.  The $66.67 figure does appear on prior drafts of the CMI and the Court is unaware of which figure is correct.  Again, this is confusing but does not change the end result.

-12-

commitment period and then divide that amount by 60 to determine the "average monthly payment" for each secured debt which may be deducted at line 47. Debtors have calculated the payment for the Escalade to be $604.71, the payment for the Civic to be $443.46, and the payment for the Monte Carlo to be $60.48. Debtors have deducted all three payments at line 47. The Trustee objects and argues that Debtors may deduct only two car payments at line 47. Further, and somewhat disingenuously considering his stance that the highest payment must be deducted at line 29, the Trustee now argues that for line 47 purposes, the highest payment for the Escalade should be excluded and only the deductions for the two less expensive vehicles should be allowed.

The Court finds no merit in any of the Trustee's objections to the Debtors' deductions for their vehicles. All of the deductions appear to have been calculated following the statutory requirements. The Trustee's objections could only be sustained if this Court were willing to read non-existent provisions into the Bankruptcy Code. This Court will not do that.

The deductions at lines 28 and 29 for vehicle ownership refer to "Vehicle 1" and "Vehicle 2" respectively. Nowhere in the IRS standards or in the Bankruptcy Code are those terms defined. It makes sense that the IRS standards do not define the terms because definition would be unnecessary there. The IRS standards, for IRS purposes, include an allowance for secured debt payments and a taxpayer gets the standard deduction regardless of the actual

-13-

amount of secured debt payment which must be made from that allowance.   If the taxpayer has two qualifying vehicles, the taxpayer gets both deductions and no difference in the total deduction results by identifying one vehicle or the other as Vehicle 1 or Vehicle 2.

For Bankruptcy Code purposes, however, the IRS standards are just the starting point on vehicle ownership deductions.  From the standard deduction, the amount of the average monthly payment for the secured debt related to a vehicle is subtracted.   Thus, mathematically, it does make a difference which vehicle is dealt with at which line when calculating disposable income.  The problem is that no guidance or direction is provided on this issue by §707(b)(2) or any other provision of the Code.  In the absence of any requirement that the Debtors designate any particular vehicle as Vehicle 1 or Vehicle 2, this Court will not read into the statute a requirement that they designate the vehicles in a manner that minimizes their available deductions.[3]  There is no statutory basis for the Trustee's position and the Court will not sustain the Trustee's objection on this issue.

As previously stated, the deduction for secured debt payments is taken at line 47.  The ability to deduct the average monthly payments on secured debt is separate and distinct from the

---

[3]     The Debtors might have maximized their deductions further by using the Monte Carlo payment at line 28 rather than line 29. The Debtors took a middle ground on the Monte Carlo and this Court will not disturb their choice by increasing the deduction.

deductions for ownership expenses at lines 28 and 29. The available deduction for payment of secured debt is defined at Bankruptcy Code Section 707(b)(2)(A)(iii) which provides:

> (iii)   The debtor's average monthly payments on account of secured debts shall be calculated as the sum of –
>
> (I)  the total of all amounts scheduled as contractually due to secured creditors in each month of the 60 months following the date of the petition; and
>
> (II) any additional payments to secured creditors necessary for the debtor, in filing a plan under chapter 13 of this title, to maintain possession of the debtor's primary residence, motor vehicle, or other property necessary for the support of the debtor and the debtor's dependents, that serves as collateral for secured debts; divided by 60.

11 U.S.C. §707(b)(2)(A)(iii).

Subsection (I) is a broad provision which includes all amounts due on secured debts regardless of the type of collateral pledged. Nothing in this section suggests that only two vehicle debts may be included.

The Trustee argues that, because the ownership deductions based on IRS standards are limited to two vehicles, the secured debt deductions should be limited in the same way. The Trustee does not, however, point to any statutory provision in support of his position.

The Trustee is, of course, correct that the ownership

deductions based on IRS standards are limited to two.  As set forth above, however, these standards are just part of the calculation. Secured debt payments are deducted out of the standards and addressed elsewhere - line 47.  Thus, the secured debt component of ownership is not included in what is deducted at lines 28 and 29. If Congress had wanted to limit the secured debts to be deducted for vehicles to only two such debts, Congress could have done so by expressly saying so at line 47.  Congress said no such thing.

Average monthly payments on secured debts for boats, campers, kitchen appliances, furniture, computers, and other electronics are all deductible at line 47.  Payments for first, second, and third mortgages are all deductible.  Nowhere does the statute state that only two vehicle debts are deductible at line 47.  Nowhere is a policy expressed that would allow payment on a boat or camper but disallow a modest payment on a third vehicle for a college student. This Court will not read into the statute any such provision and, accordingly, finds that the Debtors may deduct the average monthly payment for each of their three vehicles at line 47.

The Trustee also makes the argument that the Cadillac Escalade is a luxury vehicle which is not reasonably necessary for these Debtors.  That argument is irrelevant in determining whether the Debtors have correctly completed the CMI.  For pre-BAPCPA cases and for current cases involving under-the-median-income debtors, expenses used in computing projected disposable income are set

-16-

forth on Schedule J and are reviewed under the subjective "reasonably necessary" standard. For BAPCPA cases with over-the-median-income debtors, however, reasonably necessary is specifically defined as those expenses set forth in §707(b)(2). Section 707(b)(2), allows expenses based on charts, formulae, and some proven actual expenditures. <u>In re Davis</u>, 348 B.R. 449, 453 (Bankr. E.D. Mich. 2006). The Court does not use its own judgment on reasonableness or necessity but, rather, must determine whether a particular expense is allowed by §707(b)(2). If an expense is allowed under §707(b)(2), it meets the new definition of "reasonably necessary" and no subjective review of the expense by the Court is permitted. This Court cannot disallow an expense otherwise allowable under §707(b)(2) simply because it thinks the expense is unreasonable or unnecessary any more than this Court can allow expenses not set forth in §707(b)(2) simply because it deems the expenses reasonable and necessary. The Debtors' deduction of three secured debts for vehicles is allowed by §707(b)(2) and, accordingly, the Trustee's objection on this issue must be denied.

The Trustee also objects to the Debtors' deduction of $68 at line 37 for telecommunication services. The IRS standards allow a deduction for the average monthly amount actually paid for telecommunication services other than basic home telephone service. Basic home telephone service is already included at the line 25A deduction for Local Standards: housing and utilities. The Trustee

argues that, because the Debtors' Schedule J expenses for actual home maintenance and utility expense total $434, and because the Debtors received the standard deduction at line 25A of $402, the Debtors can claim no more than the difference between the two - $32 - at line 37.  The Trustee cites no authority for his position and identifies no provision of the statute that supports his position.

Line 25A is a standard deduction which covers home maintenance and utility expenses.  The Debtors are entitled to the deduction regardless of whether their actual expenses in those categories are higher or lower than the standard.  They are then also entitled to a deduction at line 37 for other types of telecommunication service expenses not included in line 25A.  The line 37 deduction is separate and distinct from the line 25A deduction and there is no basis to require an offset based on actual Schedule J expenses. Schedule J is irrelevant to the determination of reasonably necessary expenses for over-the-median-income debtors under BAPCPA. In re Farrar-Johnson, 353 B.R. 224, 227-28 (Bankr. N.D. Ill. 2006).

If Congress had wanted to create the relationship between line 25A and line 37 deductions that the Trustee suggests, it knew how to do it.  At line 42, an additional expense deduction is allowed for excess home energy costs.  Reference is also made at line 42, however, to the Local Standard deduction at line 25A and the amounts claimed at line 42 must be proven to be amounts actually expended in excess of the standard amounts included at line 25A.

The absence of similar language at line 37 suggests no intent to connect line 37 expenses with the standard expenses at line 25A. The Trustee's objection to the Debtors' line 37 telecommunications expense deduction is, therefore, denied.

The Trustee also objected to the Debtors' health insurance deduction at line 39. This appears to be in error. The Debtors claimed $259.82 per month in health insurance premiums paid through Mr. Carlton's employer. The Trustee asserts that the actual deduction is only $175.50 based on Mr. Carlton's pay stub. The Trustee overlooked, however, a second deduction on the pay stub for dependent health insurance coverage which amounts to $84.32 per month. The Debtors' calculations are correct and the Trustee's objection is denied.

The Trustee also objected to the Debtors' line 30 deduction for taxes. This was due, at least in part, to the dispute over how to calculate Mrs. Carlton's income. The Trustee now calculates the total taxes to be deducted at line 30 to be $1,076.54. As noted above, however, the Trustee missed the deduction for the State of Illinois income taxes from Mrs. Carlton's check which results in another $31.68 per month to be deducted. The line 30 deduction should, therefore, be $1,108.22.

The Trustee suggested changes in other deductions on the CMI which the Debtors accepted. Those changes need not be addressed by the Court. Except as set forth above with respect to the line 30

tax deductions, the Trustee's objections to the Second Amended CMI are denied.

*Trustee's Objection to First Amended Chapter 13 Plan*

The Trustee objected to confirmation of the Amended Plan alleging that the Debtors were not contributing all of their projected disposable income to plan payments.

The Debtors' Schedule I gross income is $5,599 for Mr. Carlton and $1,105.74 for Mrs. Carlton resulting in a total of $6,704.74. After resolving the contested issues regarding allowable deductions and including deductions upon which the parties agree, Part IV of the Debtors' CMI now properly includes the following:

| | | |
|-----|-----------------------------------------|-----------|
| 24. | Nat. Stds: food, etc. | $1,368.00 |
| 25A. | Local Stds: housing & utilities | $ 402.00 |
| 26. | Local Stds: housing & utility adj. | $ 120.00 |
| 27. | Local Stds: transp. - operation | $ 358.00 |
| 29. | Local Stds: transp. - ownership 2 | $ 265.33 |
| 30. | Taxes | $1,108.22 |
| 31. | Mandatory payroll deductions | $ 530.68 |
| 32. | Life Insurance | $ 57.44 |
| 36. | Other: health care | $ 100.00 |
| 37. | Other: telecommunications | $ 68.00 |
| 39. | Health Insurance | $ 259.82 |
| 47. | Secured debt payments (house + 3 cars) | $1,620.65 |

```
49.  Priority debt payment               $   34.06
50.  Ch. 13 Administrative Expenses       $  170.07
                         TOTAL:           $6,462.27
```

Subtracting the total allowed deductions from Debtors' gross income results in monthly projected disposable income to pay unsecured creditors of $242. Over the 60 months of their applicable commitment period, the Debtors would have a total to pay unsecured creditors of $14,548.20.

The Debtors' Amended Plan gives credit for four months of $1,514 payments made under the original plan and then proposes 56 months of $1,714 payments resulting in total plan payments of $102,040. The Trustee has calculated that he will disburse $66,519 over the life of the plan to make the three car payments. Further, he will pay an IRS priority claim of $2,052.19 and fees to the Debtors' attorney of $1,700. The Trustee expects his total fee to be $5,510.16. After making all of these payments, the Trustee would have $26,258.65 left to pay unsecured creditors. That amount substantially exceeds the $14,548.20 required to be paid to unsecured creditors pursuant to the disposable income test.

The Trustee's Objection to confirmation of the Debtors' Amended Plan based on an alleged failure of the Debtors to commit all of their projected disposable income to plan payments is denied. The Trustee has raised no other basis to object to confirmation and, therefore, the Amended Plan will be confirmed.

This Opinion is to serve as Findings of Fact and Conclusions of Law pursuant to Rule 7052 of the Rules of Bankruptcy Procedure. See written Order.

###